**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**ORANGEBURG DIVISION**

| | |
|---|---|
| EARTHA M. GLYNN, ) | Civil Action No.: 5:19-1303-MGL-PJG |
| ) | |
| Plaintiff, ) | **COMPLAINT** |
| ) | **Violation of Title VII and 42 U.S.C. § 1981:** |
| vs. ) | **Harassment based upon Race;** |
| ) | **Termination based upon Race; and** |
| REPUBLIC FINANCE, LLC, ) | **Retaliation** |
| ) | |
| Defendant. ) | **JURY TRIAL DEMANDED** |
| _____) | |

The plaintiff above named, complaining of the acts of the above-named defendant, states as follows:

**PARTIES AND JURISDICTION**

1. That the plaintiff is a resident and citizen of the County of Bamberg, State of South Carolina.

2. That, upon information and belief, the defendant Republic Finance, LLC ("defendant") is a foreign corporation doing business and maintaining offices and agents throughout the State of South Carolina, including the County of Orangeburg, South Carolina.

3. That this court has federal question jurisdiction pursuant to 42 U.S.C. §2000e-2, 42 U.S.C. §2000e-3, 42 U.S.C. §2000e-5, 42 U.S.C. § 1981, and 28 U.S.C. §1331.

4. That venue for all causes of action stated herein lies in the District of South Carolina, Orangeburg Division, in that, pursuant to 28 U.S.C. § 1391(b), the parties reside and do business in this district, and a substantial part of the events giving rise to plaintiff's claims occurred here.

**CONDITIONS PRECEDENT**

5. That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below. Moreover, at all relevant times as defined by Title VII defendant employed and currently employs fifteen (15) or more employees and, as such, is an "employer" as defined by Title VII, and otherwise subject to said Act.

6. That on or about July 17, 2018, and as result of defendant's discriminatory conduct, all of which is more fully described below, plaintiff timely filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging harassment and discrimination based upon race and retaliation.

7. That on or about April 16, 2019, the plaintiff received her Notice of Right to Sue from the EEOC regarding the complaint described above in Paragraph 6.

8. That plaintiff has timely filed this action within ninety (90) days of the date on which she received the Notice of Right to Sue described above in Paragraph 7.

**FACTS**

9. That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 8 hereinabove as fully as if set forth verbatim.

10. That plaintiff is African-American.

11. That plaintiff began to work at defendant in or around June of 2017 through Aerotek, a staffing agency. As a temporary employee, plaintiff worked at defendant's Orangeburg, South Carolina location as a Customer Service Representative ("CSR").

12. That on or about September 21, 2017, defendant hired plaintiff directly to work as an Operations Specialist at the same Orangeburg, South Carolina location.

13. That as an Operations Specialist, plaintiff reported to a Branch Manager, Alyssa Seamon-Stacey ("Seamon-Stacey"). Seamon-Stacey, in turn, reported to a Regional Vice-President, Robert Holladay ("Holladay"). Both Seamon-Stacey and Holladay are Caucasian.

14. That in addition, the location employed a Collection Specialist, Annette Gibson ("Gibson") and three (3) CSR's, Erin Cook ("Cook"), Ashlie Headden ("Headden") and Victoria Loicanno ("Loicanno"). With the exception of Loicanno who, upon information and belief is African-American and Italian, said other above-named employees are Caucasian.

15. That plaintiff performed her job duties at defendant in an above-satisfactory fashion and otherwise maintained an excellent employment record there. To this end, plaintiff was rated as "outstanding" on her six (6) month performance evaluation at defendant - the only evaluation plaintiff ever received at defendant. Holladay routinely praised plaintiff's job performance by telling plaintiff that she did a good job. And, plaintiff was never disciplined the entire time she worked at defendant.

16. That despite the above, Seamon-Stacey began to harass and discriminate against plaintiff based upon plaintiff's race by engaging in conduct that includes, but is not limited to, the following:

   a) Gibson routinely referred to Asian workers at a nearby nail salon as "chinks." She would do this openly in the office, in front of Seamon-Stacey. When Seamon-Stacey heard the remarks, she would laugh at or ignore them. She never admonished Gibson for the racially insensitive remarks;

   b) Seamon-Stacey would openly remark in the office that she could not stand the African-American mail carrier and she would refer to the mail carrier as a "hood rat." Seamon-Stacey made this remark repeatedly;

   c) On one occasion in December of 2017, an African-American male customer came into the store to make a payment. In doing so, he was surprised to learn that he had accrued some late fees and challenged Seamon-Stacey about it. Seamon-

    Stacey argued with the customer to the point where the customer made a remark to the effect that he felt she was discriminating against him due to his race. When the customer left, Seamon-Stacey looked to plaintiff and stated, "Well Eartha, I guess he didn't see you sitting here;"

d) On yet another occasion, an African-American customer who was filling out paperwork in the office asked plaintiff if plaintiff was an AKA (a predominantly African-American sorority) when she was in college. When plaintiff responded in the negative, Cook asked plaintiff what the customer was referring to. As plaintiff began to explain to Cook that AKA was a predominantly black sorority, Seamon-Stacey interrupted plaintiff, stating she had already dealt with one of "them" before and that she made sure to get rid of her - referring to a past African-American former employee named Lydia;

e) In the fall of 2017, an African-American named Vanita Williams ("Williams") was working at defendant as a temporary employee through Aerotek. Plaintiff would hear Seamon-Stacey, Cook and Gibson say they did not care for Williams and they repeatedly referred to her as "ratchet" and said she had to go. Seamon-Stacey even stated that she couldn't stand "their kind" and that she had to find a way to get rid of Williams like she did the others. (Seamon-Stacey would brag that she forced two former temporary African-American CSR's (Lydia and Carrie) to quit their jobs at defendant.)

    Sometime in or around November of 2017, Seamon-Stacey, Gibson, Cook, Loicanno, Headden and plaintiff were walking out of the office to the parking lot. In doing so, Gibson said words to the effect that she did not care for Williams' attitude, in that she would not engage in small talk with some of the other employees. Loicanno responded that she did not have issues with Williams and asked why others in the group did not like her. Seamon-Stacey responded by stating "You know why" and then began to rub her bare arm up and down with her fingers to call attention to skin color. Seamon-Stacey further remarked (or bragged) that she could "make anyone's life a living hell," and that she forced another African-American CSR from Aerotek (Carrie) to quit by taking away certain privileges, like smoke breaks, the use of cell phones, and the ability to have visitors at work. Seamon-Stacey further stated that the African-American CSR's, like Carrie and Williams, did not want to talk to white people. Seamon-

4

        Stacey then began to articulate strategies on how she planned to get rid of Williams, i.e., taking away her work breaks, cell phone and visitor privileges. She further opined that all the other employees would be subject to the same restrictions, until Williams quit. When Cook asked Seamon-Stacey if her plan would work, Seamon-Stacey stated it had worked for her in the past, but that she was no longer allowed to fire anymore of "them," so they would have to quit on their own. Shortly thereafter, Seamon-Stacey ended Williams' employment at defendant;

    f) Seamon-Stacey would take loans away from plaintiff and give them to other employees outside of plaintiff's protected class;

    g) Seamon-Stacey would speak to plaintiff in an antagonistic and rude manner, many times in front of plaintiff's peers and customers in the open office. She did not treat Caucasian employees in the office in the same manner;

    h) She would micromanage plaintiff, nitpick at plaintiff's satisfactory work and be overly and unreasonably critical of it - again, oftentimes in front of plaintiff's peers and, again, she did not treat others outside plaintiff's protected class in this manner; and

    i) In general, she showed favoritism to other employees at defendant outside of plaintiff's protected class, such as Cook, Gibson and Loicanno.

17. That on or about January 2, 2018, plaintiff met with Seamon-Stacey and complained to her that she was taking loan accounts from her and giving them to others. After listening to plaintiff and viewing the specific accounts at issue, Seamon-Stacey acknowledged the accounts should not have been taken from plaintiff. Seamon-Stacey apologized for "overlooking" the issue, but claimed there was nothing she could do about it.

18. That at the conclusion of the meeting, Seamon-Stacey warned plaintiff that if plaintiff ever needed to voice any more complaints about the office environment, plaintiff needed to go through her or Holladay because that was the chain of command, and no one from the home office would be able to help plaintiff.

19. That Seamon-Stacey stated on several occasions that, due to her relationship with Holladay, Holladay would always have her back and would never discipline her. Upon information and belief, Holladay and Seamon-Stacey may have been involved in an inappropriate relationship.

20. That on or about Friday, January 12, 2018, plaintiff became ill while at the office, but managed to work through the day. Before plaintiff left that day, Seamon-Stacey told plaintiff (in the breakroom) that plaintiff better get well over the weekend because another employee was out sick, so plaintiff could not take any sick leave the following week.

21. That on or about the following Monday, January 15, 2018, plaintiff spoke to Seamon-Stacey before coming to work, telling her that she was still very sick, but that she would come in to work per Seamon-Stacey's comments the previous Friday.

22. That within two (2) hours of arriving to work, plaintiff had to leave to go to the hospital due to her illness. By contrast, on or about Monday, January 8, 2018, Seamon-Stacey allowed Cook to take a personal day off of work because she was going through a breakup with her on again, off again boyfriend.

23. That on or about January 26, 2018, plaintiff was performing her duties and covering for Cook, who was out for half a day buying a vehicle. In the course of the morning, Seamon-Stacey asked plaintiff whether plaintiff would like to go to lunch at 12:30 p.m. or her original time of 1:00 p.m. When plaintiff picked a time for lunch, Seamon-Stacey began to scold plaintiff in front of customers, asking plaintiff where she thought she was going and exclaiming just because Cook was out, did not mean plaintiff could pick up and leave the office for lunch - this despite the fact that Seamon-Stacey had already approved plaintiff's lunch for that particular time.

24. That the episode was so unreasonable and confusing that plaintiff spent her lunch period crying in the parking lot. While plaintiff was upset, one of her coworkers, Headden, approached plaintiff and advised plaintiff that she had noticed the different way in which Seamon-Stacey was treating plaintiff compared to the other employees at the location outside plaintiff's protected class.

25. That as a result of all of the above, on or about Thursday, February 1, 2018, plaintiff called a Human Resource Advisor at defendant, Jackie Carpenter ("Carpenter"), and complained that Seamon-Stacey was harassing and discriminating against her due to her race. During the call, plaintiff told Carpenter about the disparate treatment she was receiving from Seamon-Stacey, and about the various race-related remarks outlined above. Carpenter acknowledged that the matter was serious and advised that she would speak to Holladay about it.

26. That on or about that same day, Headden also called Carpenter and reported that she witnessed plaintiff being harassed and discriminated against at defendant due to her race.

27. That in response to the complaints, Holladay (who was visiting the office that day) interviewed the employees of the branch one on one. During plaintiff's interview, plaintiff again reported that she was being harassed and discriminated against due to her race, and that plaintiff further believed Headden was now being retaliated against by defendant for corroborating plaintiff's complaint. In response, Holladay assured plaintiff that he was looking into the matter and he further praised plaintiff for being articulate and for doing an outstanding job with customer service. He also told plaintiff that it appeared to him the dynamic in the office was plaintiff and Headden versus Seamon-Stacey and the other Caucasian CSR's.

28. That during Headden's interview, she also (and again) reported that she witnessed plaintiff being harassed and discriminated against due to her race at defendant.

29. That on or about Monday, February 5, 2018, Holladay directed plaintiff to accompany him and Seamon-Stacey to a café in the Cornerstone Church to further discuss the matter. During the meeting, Seamon-Stacey defiantly stated that she was not a racist. And, Holladay stated that he could see there was tension between Seamon-Stacey and plaintiff, and he acknowledged that nothing had been resolved at the meeting. In fact, the meeting was unproductive and made the environment even more abusive. Rather than bringing plaintiff face-to-face with her harasser, defendant should have suspended Seamon-Stacey and conducted a competent investigation into plaintiff's complaints.

30. That thereafter, Seamon-Stacey began to retaliate against plaintiff for reporting the race discrimination. For example, Seamon-Stacey would micromanage plaintiff's production throughout the day by standing next to plaintiff's desk with sticky notes, falsely documenting that plaintiff was not doing her job correctly. She would yell at plaintiff in front of customers. And, she constantly made mean and aggressive remarks to plaintiff. Seamon-Stacey also began to repeatedly ask plaintiff if plaintiff wanted to or was planning on transferring to another location.

31. That on or about February 13, 2018, Seamon-Stacey sent plaintiff home for an alleged dress code violation. According to Seamon-Stacey, the winter boots plaintiff wore to work that day were too tall, as they came up to the bottom of plaintiff's knees. Seamon-Stacey further told plaintiff that Holladay did not appreciate her "insubordination" in violating the dress code. The allegation was false and retaliatory. Plaintiff's attire was very work like and appropriate. It did not violate any dress code policies at defendant.

32. That in leaving the office that day, plaintiff called Holladay and reported that she believed she was being retaliated against by Seamon-Stacey. Plaintiff also sent Holladay a picture of the work outfit she was wearing that day to prove there was no dress code violation. In response, Holladay told plaintiff not to worry and that he would take care of it.

33. That within approximately thirty (30) minutes of plaintiff's call to Holladay, Carpenter called plaintiff about the matter. By this time, Carpenter was in possession of the picture of plaintiff's clothing that plaintiff had sent to Holladay. After viewing the picture, Carpenter agreed there was nothing wrong with the way plaintiff was dressed that day and that plaintiff's attire was perfectly fine for an office setting. Carpenter ended the call by telling plaintiff she would speak to Seamon-Stacey and Holladay about it and get back to plaintiff by the end of the day.

34. That at or around 5:00 p.m. that day, Carpenter called plaintiff back, but this time her tone had changed. In an aggressive manner, Carpenter advised plaintiff that Seamon-Stacey did not harbor any hard feelings toward plaintiff; that according to Seamon-Stacey, plaintiff was being insubordinate with respect to cell phone use in the office and other matters (a charge that is entirely false); and that, if the matter continued, it would not end good for plaintiff.

35. That on or about February 21, 2018, Seamon-Stacey and Holladay went on an overnight business trip together.

36. That on or about February 23, 2018, an African-American female came into the branch to make a payment. The customer made the payment to plaintiff and then left. After the customer left the store, Headden asked everyone present if they had seen "that" - referring to the size of the customer's posterior. In response, Cook laughed and exclaimed "Who didn't

9

see it."  Gibson remarked that, with one of the customer's cheeks, "we would all be set." Plaintiff remarked "That's why I go to the gym, so I can work out to get one half of that."

37. That on or about February 27, 2018, Holladay was at the branch when plaintiff arrived to work.  He immediately directed plaintiff to the back of the store for a meeting with him and Carpenter, who was in attendance by telephone.

38. That before anything was said, plaintiff noticed that Holladay had already prepared termination papers for her.  Plaintiff was immediately asked if she made a comment about a customer in the store February 23, 2018.  Plaintiff calmly responded to Holladay and Carpenter that she had made an innocuous remark about the customer and plaintiff described the remark.  In the course of plaintiff's explanation, Holladay and Carpenter interrupted plaintiff and terminated her.  In the process, Carpenter remarked that plaintiff was being fired because she was such good friends with Headden and that plaintiff should have stopped Headden from making her comment.

39. That on that same day Headden was called in to meet with Holladay and Carpenter about the incident.  Plaintiff was not in the meeting, but Headden advised plaintiff that during the meeting Headden told Holladay and Carpenter that she, Cook and Gibson also made remarks about the customer and she described the content of their comments.  Headden further advised plaintiff that she also stated in the meeting that such remarks were routinely made in the office, that many of them were made or condoned by Seamon-Stacey, and that most of them were far worse than the ones at issue.

40. That during Headden's meeting she was also fired.  On the other hand, Cook, Gibson and Seamon-Stacey were not even reprimanded, let alone terminated.

**FOR A FIRST CAUSE OF ACTION:**
**VIOLATION OF TITLE VII**
**HARASSMENT BASED UPON RACE**

41. That the plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 40 hereinabove as fully as if set forth verbatim.

42. That at all pertinent times as required by Title VII, defendant employed fifteen (15) or more employees and, as such, is an "employer" as defined by Title VII, and otherwise subject to the said Act.

43. That defendant's repeated and continuous discriminatory conduct as described above was offensive and unwelcome, and plaintiff so advised defendant.

44. That said harassment described above was based on plaintiff's race.

45. That defendant's behavior humiliated plaintiff, unreasonably interfered with plaintiff's work performance, affected the terms, conditions and privileges of plaintiff's employment, and otherwise caused plaintiff severe psychological and physical harm.

46. That defendant's actions as alleged above created a work environment that plaintiff found, and a reasonable person would find, hostile and abusive.

47. That on several occasions plaintiff and others complained about the above-described discrimination and harassment directly to defendant and defendant was otherwise on notice (or should have been) that the harassment was occurring as it occurred openly and on a widespread basis at the defendant.

48. That defendant wholly failed to take prompt and effective remedial action to end the harassment, and defendant continued to harass and discriminate against the plaintiff, even after plaintiff complained about it to defendant.

49. That the actions of defendant in engaging in the offensive conduct described above constitutes discrimination against plaintiff based upon her race and is in violation of Title VII and the Civil Rights Act of 1991.

50. That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and further seeks attorney's fees and costs and prejudgment interest.

51. That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

**FOR A SECOND CAUSE OF ACTION:**
**VIOLATION OF 42 U.S.C. § 1981**
**HARASSMENT BASED UPON RACE**

52. That the plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 51 hereinabove as fully as if set forth verbatim.

53. That as an employee of defendant, 42 U.S.C. § 1981 guarantees plaintiff the right to make and enforce contracts, including the right to the enjoyment of all benefits, privileges, terms and conditions of her contractual relationship with defendant. As such, plaintiff is covered and protected by the mandates of 42 U.S.C. § 1981.

54. That defendant's repeated and continuous discriminatory conduct as described above was offensive and unwelcome, and plaintiff so advised defendant.

55. That said harassment described above was based on plaintiff's race.

56. That defendant's behavior humiliated plaintiff, unreasonably interfered with plaintiff's work performance, affected the terms, conditions and privileges of plaintiff's employment, and otherwise caused plaintiff severe psychological and physical harm.

57. That defendant's actions as alleged above created a work environment that plaintiff found, and a reasonable person would find, hostile and abusive.

58. That on several occasions plaintiff and others complained about the above-described discrimination and harassment directly to defendant and defendant was otherwise on notice (or should have been) that the harassment was occurring as it occurred openly and on a widespread basis at the defendant.

59. That defendant wholly failed to take prompt and effective remedial action to end the harassment, and defendant continued to harass and discriminate against the plaintiff, even after plaintiff complained about it to defendant.

60. That the actions of defendant in engaging in the offensive conduct described above constitutes discrimination against plaintiff based upon her race and is in violation of 42 U.S.C. § 1981.

61. That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and further seeks attorney's fees and costs and prejudgment interest.

62. That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the

federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

### FOR A THIRD CAUSE OF ACTION:
### VIOLATION OF TITLE VII
### TERMINATION BASED UPON RACE

63. That the plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 62 hereinabove as fully as if set forth verbatim.

64. That plaintiff is African-American.

65. That at all times during plaintiff's employment at defendant, plaintiff performed her job duties in an above-average fashion and otherwise in a manner that met defendant's reasonable and legitimate expectations.

66. That despite the above, defendant terminated plaintiff.

67. That after plaintiff's termination, plaintiff's position remained open and/or defendant replaced plaintiff with someone outside of plaintiff's protected class. Moreover, other similarly situated employees outside of plaintiff's protected class were treated more favorably than plaintiff when they engaged in conduct similar to plaintiff's alleged conduct.

68. That defendant terminated plaintiff without warning, notice or cause and for false reasons and/or reasons that lack credibility and/or reasons so trivial they would not warrant termination, all because of plaintiff's race.

69. That as such, defendant has violated Title VII.

70. That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation,

loss to professional standing, character and reputation, physical and personal injuries, and further seeks attorney's fees and costs and prejudgment interest.

71.     That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

### FOR A FOURTH CAUSE OF ACTION:
### VIOLATION OF 42 U.S.C. § 1981
### TERMINATION BASED UPON RACE

72.     That the plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 71 hereinabove as fully as if set forth verbatim.

73.     That as an employee of defendant, 42 U.S.C. § 1981 guarantees plaintiff the right to make and enforce contracts, including the right to the enjoyment of all benefits, privileges, terms and conditions of her contractual relationship with defendant.  As such, plaintiff is covered and protected by the mandates of 42 U.S.C. § 1981.

74.     That plaintiff is African-American.

75.     That at all times during plaintiff's employment at defendant, plaintiff performed her job duties in an above-average fashion and otherwise in a manner that met defendant's reasonable and legitimate expectations.

76.     That despite the above, defendant terminated plaintiff.

77.     That after plaintiff's termination, plaintiff's position remained open and/or defendant replaced plaintiff with someone outside of plaintiff's protected class. Moreover, other similarly situated employees outside of plaintiff's protected class were treated more favorably than plaintiff when they engaged in conduct similar to plaintiff's alleged conduct.

78. That defendant terminated plaintiff without warning, notice or cause and for false reasons and/or reasons that lack credibility and/or reasons so trivial they would not warrant termination, all because of plaintiff's race.

79. That as such, defendant has violated 42 U.S.C. § 1981.

80. That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and further seeks attorney's fees and costs and prejudgment interest.

81. That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

### FOR A FIFTH CAUSE OF ACTION: VIOLATION OF TITLE VII RETALIATION

82. That the plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 81 hereinabove as fully as if set forth verbatim.

83. That at all pertinent times defendant employed fifteen (15) or more employees and, as such, is an "employer" as defined by Title VII, and is otherwise subject to the said Act.

84. That as alleged above, plaintiff made several complaints to management and Human Resource employees at defendant alleging she was being harassed and discriminated against based upon her race and retaliated against.

85. That plaintiff's complaints were made in good faith, and constitute protected activity under Title VII.

86. That within thirteen (13) days of the date plaintiff first reported defendant's harassment and discrimination, defendant disciplined her for false and trivial reasons and for reasons that otherwise lacked credibility. Then, within fourteen (14) days from the last time plaintiff engaged in protected activity, defendant terminated plaintiff without warning, notice or cause and for false reasons, and/or reasons that lack credibility and/or reasons so trivial they would not warrant termination.

87. That defendant disciplined and terminated plaintiff because plaintiff made complaints of harassment and discrimination based upon race and retaliation and because plaintiff otherwise opposed discrimination based on race, all of which is in violation of 42 U.S.C. § 2000e-3.

88. That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and further seeks attorney's fees and costs and prejudgment interest.

89. That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

## FOR A SIXTH CAUSE OF ACTION:
## VIOLATION OF 42 U.S.C. § 1981
## RETALIATION

90. That the plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 89 hereinabove as fully as if set forth verbatim.

91. That as an employee of defendant, 42 U.S.C. § 1981 guarantees plaintiff the right to make and enforce contracts, including the right to the enjoyment of all benefits, privileges, terms and conditions of her contractual relationship with defendant. As such, plaintiff is covered and protected by the mandates of 42 U.S.C. § 1981.

92. That as alleged above, plaintiff made several complaints to management and Human Resource employees at defendant alleging she was being harassed and discriminated against based upon her race and retaliated against.

93. That plaintiff's complaints were made in good faith, and constitute protected activity under 42 U.S.C. § 1981.

94. That within thirteen (13) days of the date plaintiff first reported defendant's harassment and discrimination, defendant disciplined her for false and trivial reasons and for reasons that otherwise lacked credibility. Then, within fourteen (14) days from the last time plaintiff engaged in protected activity, defendant terminated plaintiff without warning, notice or cause and for false reasons, and/or reasons that lack credibility and/or reasons so trivial they would not warrant termination.

95. That defendant disciplined and terminated plaintiff because plaintiff made complaints of harassment and discrimination based upon race and retaliation and because plaintiff otherwise opposed discrimination based on race, all of which is in violation of 42 U.S.C. § 1981.

96. That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and further seeks attorney's fees and costs and prejudgment interest.

97. That the defendant's actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendant.

WHEREFORE, as to all causes of action, plaintiff prays for the following relief against defendant: for such amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the cost and disbursements of this action, including reasonable attorney's fees, prejudgment interest and for such other and further relief as the court deems just and proper.

HITCHCOCK & POTTS

By: *s/A. Christopher Potts*
Federal ID No.: 5517
31 Broad Street, 2nd Floor
Charleston, SC 29401
Telephone: (843) 577-5000
Email: hitchp@bellsouth.net
*Attorneys for the Plaintiff*

Charleston, South Carolina
May 3, 2019